## Nugent et al. v. Nugent's Ex'r et al.

Jan. 12, 1940.

:264

W. S. Heidenberg for appellants.

Gordon, Laurent, Ogden & Galphin and Squire R. Ogden for appellees.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

The appellants, Elizabeth N. Nugent and Marian M. Nugent, contested the will of their uncle, Edward B. Nugent, basing their right to appeal on a former will,

dated in 1928, devising his entire estate to them. At the conclusion of all the evidence the trial court directed a verdict upholding the will and from the judgment entered on the verdict this appeal is prosecuted.

The testator was one of five brothers, Robert, Thomas, William, Richard and Edward B., two of whom, Thomas and William, survived the testator. Richard died in 1915 after being engaged with his brothers in the sand business under the firm name of Nugent Sand Co., and the appellants are his children. Edward, the testator, promised Richard that he would care for his children and this promise was faithfully kept. The relation between them was almost that of father and children and he lived for years with them in their home and the home of their mother, Mrs. Florence Nugent. The appellants were educated by Edward in New York and in recent years have made their home there but the separation did not diminish the devotion between them and their uncle.

Until the year 1931, Will, Thomas and Robert owned the stock of the sand company and early in that year Robert gave his one-third of the stock (167 shares) to Edward. In May of the same year Robert died leaving a will in which he ratified and confirmed his gift of the stock to Edward. Thereafter Edward, Will and Thomas conducted the business of the sand company until difficulties and litigation arose between Will on the one side and Thomas and Edward on the other, the feeling between Will and Edward being particularly bitter. Will had been president of the company but as a result of the disagreement he was forced out and Thomas was elected president. Edward remained a salaried officer until his death.

In 1932, Edward transferred his stock to Thomas, except three shares to qualify him to remain a director. During this time Edward was also engaged in the real estate business, but in 1933 became a bankrupt. (Reading between the lines, it is probable that the real purpose behind the will contest is to clear the way for an action against Thomas to set aside the transfer of the stock to him by Edward, since Edward's estate, unless this stock were considered an asset, amounted to almost nothing.)

In January, 1935, Edward's health had failed to such an extent that he practically ceased work and devoted himself to efforts to recuperate. These efforts

were fruitless and about the last of May he was admitted to St. Joseph's Infirmary where he remained until his death on July 10, as a result of cancer of the spinal column. He was confined to his bed during all this time and for some weeks prior to his death opiates, mostly codeine and morphine, were administered to alleviate his suffering.

The principal question to be determined on this appeal is whether there was sufficient evidence of the testator's mental incapacity to require a submission of the case to the jury. While some mention is made in the brief of undue influence, the only testimony referred to in that connection is that of Mrs. Florence Nugent, mother of appellants, as to a statement made by Thomas on the afternoon of July 8th that "Ed will have to change that will—he will have to do different about that stock." This isolated statement, if made, unaccompanied by any facts or circumstances showing even a reasonable opportunity on Thomas' part to exercise undue influence over the testator, we do not regard as constituting a scintilla of evidence, even within the original and strict meaning of the scintilla rule—that is, we do not consider it as the slightest sign or trace of evidence that undue influence was actually exercised by Thomas over the testator.

To sustain their contention of the testator's mental incapacity, five witnesses were introduced by the appellants. Elizabeth, one of the appellants, Mrs. Florence Nugent, their mother, and Mrs. Martha Nevils, expressed opinion as to the testator's lack of capacity but a careful examination of their entire testimony discloses that their non-expert opinions were not supported by any facts or circumstances tending to confirm their opinions. Not one fact related by them tends to establish lack of capacity—such facts as they related showed only that the testator realized that he was approaching death, that he suffered greatly, that he was indisposed to conversation and appeared to be disgusted in general with the remnant of life he realized remained to him. Testimony of this character has often been held insufficient to authorize a submission of the case to the jury. See Godman et al. v. Aulick et al., 261 Ky. 268, 87 S. W. (2d) 612, and the many authorities therein cited.

Father Aloysius, a Catholic priest, who talked with the testator some days before his death, expressed the

opinion that he did not have "full use of his mental faculties." Here, again, was non-expert opinion testimony open to the condemnation pointed out above and, even were this not so, it is apparent that even if the testator did not have full use of his mental faculties, he might well have had ample mental capacity to make a will. We entertain no doubts as to the insufficiency of the evidence furnished by the above named witness to require a submission to the jury under doctrine announced in Godman v. Aulick, supra, and other cases therein referred to.

We come to a more difficult question, however, in considering the testimony of Dr. Leo Block, a physician introduced by the appellants. Dr. Block was not an attending physician and never saw the testator during his illness. He must therefore be considered an expert witness, yet he was not testifying as does the usual expert to whom a hypothetical question is propounded. By agreement, the usual medical chart kept by professional nurses was introduced in evidence, showing the testator's condition at frequent and regular intervals during his hospitalization, and showing also different alleviatory measures adopted, medicines taken and opiates administered. Dr. Block, after an examination of this chart expressed an adverse opinion of the testator's mental capacity. Had this physician merely expressed this opinion as the usual expert answering a hypothetical question, we would be rather inclined to conclude that his testimony, when placed in its proper setting and balanced with most cogent and convincing evidence for the appellee (to be hereafter referred to) did not furnish a scintilla of evidence requiring a submission to the jury in view of the slight weight accorded to purely expert testimony in our courts as evidenced by a long line of cases, including Kentucky Traction & Terminal Co. v. Humphrey, 168 Ky. 611, 182 S. W. 854; Dossenbach et al. v. Reidhar's Ex'x et al., 245 Ky. 449, 53 S. W. (2d) 731, and many cases therein cited. Here, however, this expert opinion was expressed after an examination of the chart referred to, which furnished a much more solid and tangible basis as a foundation for the opinion than is furnished by the ordinary hypothetical question. We have no doubt that Dr. Block's testimony furnished a scintilla of evidence, requiring a submission to the jury under our existing rule of practice known as the scintilla rule. Were this rule of practice to be con-

tinued in effect, this opinion might well be ended at this point, but our conclusions concerning it make necessary a further examination of the evidence to determine whether or not we would have reversed the judgment because the verdict was flagrantly against the evidence, had the case been submitted to the jury and a verdict returned against the will.

The testimony of Dr. Block, not only constitutes a scintilla of evidence, but might be thought to be of such potency as being sufficient to sustain a verdict against the will were it not arrayed against an abundance of most convincing and, we might say, overwhelming testimony that the testator had ample mental capacity to make a will. The will bequeathed the testator's real estate business to the Catholic Bishop—the evidence shows that it was of little value. A watch was bequeathed to a nephew. The testator confirmed the transfer of the Nugent Sand Company stock by him to Thomas in 1932 and it is then recited that Thomas, at the testator's request, had *theretofore* given to the appellants 37 shares of the stock and agreed that the 3 shares retained by the testator should belong to appellants. The appellants were made residuary legatees and Thomas was named as executor.

As a matter of fact the 37 shares of stock were not given by Thomas to appellants before the testator's death. (They were transferred to them by Thomas about two months thereafter.) It is urged that this fact creates an inference of mental unsoundness and this might be true were it not for the most convincing explanation of the situation by Verser Conner, an attorney of eminent character and attainments who drafted the will. He explains that both he and the testator knew that the stock had not been transferred but that it was the desire and intention of both Thomas and the testator to make the transfer and, in writing the will, he assumed that the transfer would have been effected before Edward's death.

There is some conflict as to whether the will was executed on the night of July 8th or July 9th, but we do not regard this as material, since Dr. Block in his testimony did not make any distinction as to the testator's mental condition on the respective dates. The weight of the evidence seems to us to indicate that it was executed on the 8th. That date appears in the attestation.

clause. Mr. Conner states that this was the third draft of the will made by him. The first draft, made about June 20, did not contain the bequest to the Bishop and the nephew and the number of shares of stock to be given by Thomas to appellants was left blank. This draft was returned to him and it was redrafted, the number of shares to be given by Thomas to appellants being placed at 77, which number he says had been determined by the testator as the number that could safely be parted with by Thomas without danger of Will getting control of the company. This will was actually signed by the testator on June 27 and witnessed by only one witness. On July 8 Mr. Conner was informed by Thomas that Edward desired to make some correction in the will, whereupon he went to the hospital and had a long consultation with the testator. In this conversation the number of shares to be given to appellants was discussed again and it was decided that if Will should be successful in litigation then pending a transfer of more than 37 shares to appellant might possibly result in Will's obtaining control of the company. In this connection the testator remarked, "For God's sake, Verser, don't ever let that happen." It appears beyond doubt that one of the moving passions of Edward's life was that control of the company should not pass into Will's hands. As a result of this conversation Mr. Conner redrafted the will fixing the number of shares to be given appellants at 37 instead of 77, added the other minor bequests, and sent it out to the hospital the same day. It was signed either that night or the next. Mr. Conner is positive that at each time he talked with the testator he had a complete and comprehensive grasp of his affairs and an accurate understanding of the litigation with his brother, Will.

Dr. E. F. Horine examined the testator for more than an hour on the night of July 8, just after the will was executed, if it was executed that night, and saw him again on the morning of July 9. He, also, is most positive that the testator had ample mental capacity to make a will.

Dr. Glenn Spurling examined him on June 17 and talked with him several times thereafter and says that his mind was normal.

Dr. Arthur C. McCarty, attending physician and attesting witness to the will, is most positive as to mental

capacity. The will was signed by the testator himself with a fountain pen in the presence of this witness and in the presence of others, including the mother of appellants who testifies to no fact indicating that he did not then comprehend what he was doing.

It appears on cross examination that Dr. Block based his opinion of mental incapacity in a large degree on the fact that large quantities of opiates were being administered but the other three physicians state that the quantities of opiates administered were not large and were such as could not possibly affect the testator's mental faculties and in fact did not do so. The chart showed that on July 7th at one time and again at nine P. M. on July 9 the testator was talking "irrationally." The presumption must necessarily be indulged that at other times he was not irrational in the opinion of the nurse. It appears without contradiction that on July 10, the date of death, the last rites of the Catholic church were held for the testator and he made the responses constituting his part of that ritual.

A careful consideration of all the testimony, the mere substance of which we have attempted to set out convinces us that the opinion of Dr. Block when arrayed against the direct and positive testimony of Mr. Conner and the eminent physicians we have named, while constituting a scintilla of evidence, would not have been sufficient to sustain the verdict had the case been submitted to the jury and a verdict returned against the will—we would have been compelled to hold that the verdict was so flagrantly against the evidence as to require it to be set aside.

Thus we are faced with the question whether the judgment should be reversed because of the trial court's failure to submit the case to the jury on the scintilla of evidence—in other words, shall we continue to follow the scintilla rule prevailing in this jurisdiction from the beginning? We have determined that we should not do so and that the time has arrived when another step should be taken to bring us into harmony with the well nigh unanimous rule of practice in state and federal courts. That the scintilla rule has been abandoned in most jurisdictions, see 26 R. C. L. 1070, 64 C. J. 309. The time arrives sooner or later when dead wood must be trimmed from a tree lest its growth be endangered. We feel that the scintilla rule is "dead wood" and that the time

has arrived. With this idea in view, a brief history of the rule and statement of our reasons is appropriate.

Judges were originally the triers of the fact as well as law. We had them many centuries prior to the institution of the jury system. The power of the judge to set aside verdicts was recognized from the beginning, Blackstone, Book III, page 375. It was uniformly and unquestionably accepted as being necessary to the administration of justice and ceased to be questioned centuries ago—it is as old as the jury system itself. It was brought into our jurisprudence as a part of the common law and received legislative sanction in the adoption of the first Code of Practice in 1851 (Section 381) which authorized the granting of new trials on numerous grounds, including the ground that the verdict was not sustained by the evidence or was contrary to law. As a concomitant of this power, which was also a duty derivative from the power, it logically followed that where the judge was imbued with the realization that if he submitted the case to the jury and there was a verdict for plaintiff, it must be set aside as not being sustained by the evidence, there should have been a non suit or peremptory instruction. Possibly through fear (for the security of their positions) on the part of the judges or through extreme reluctance on their part to invade the province of the jury, or a combination of these two considerations, logic and reason were abandoned, and the practice developed of submitting the case to the jury if there was the slightest trace, a scintilla, of evidence supporting the plaintiff's case, although the trial court may have possessed a settled conviction that any verdict that might be rendered for the plaintiff must be set aside as not being sustained by sufficient evidence.

The rule was probably first announced in this state with any degree of definiteness in 1856 in Thompson v. Thompson, 17 B. Mon. 22, and confirmed in 1884 in Buford v. Louisville & N. R. Co., 82 Ky. 286. The reason assigned was that the Court "may not inflict such serious injury to the successful party as by a peremptory instruction to find against him. If his verdict be set aside, he will have another opportunity, upon another trial, of strengthening his case by additional testimony. Whereas, if he be cut off by a peremptory instruction to find against him, there is an end of the case." The weakness of the rule's foundation is revealed in this, its first definite pronouncement in our state. Attention was

called to this by the Supreme Court in Pleasants v. Fant, 22 Wall. 116, 89 U. S. 116, 22 L. Ed. 780, in which that court branded the scintilla rule as an absurdity, and pointed out that the plaintiff could submit to a non suit and try his case again if he could strengthen it. The same procedure is available today under our practice for when the trial court has indicated a peremptory instruction a plaintiff, who has reason to believe he may strengthen his case on another trial, may dismiss without prejudice before the jury is actually instructed. McBurney's Heirs v. Hopper, 280 Ky. 295, 133 S. W. (2d) 100. It is only where limitation has run at the time of trial that he could be deprived of the opportunity of strengthening his case on another trial. And, after all, is there any sound reason why a party should not be ready for trial when his case is called? An old saying, and one worthy of continued acceptation, is that every litigant is entitled to his day in court. But he is not guaranteed *more* than one day or fair opportunity, to present his case. Louisville Gas Co. et al. v. Kentucky Heating Co., 142 Ky. 253, 134 S. W. 205.

Those of the legal profession who follow closely the decisions of this court must necessarily have seen the gradual inroads on the scintilla rule and comments of the court thereon foreshowing its ultimate abandonment. The quantum of evidence constituting a scintilla has always necessarily been nebulous and shadowy. The accepted and ordinary definition of a scintilla is "the slightest particle or trace." The New Merriam-Webster Dictionary. It has been defined in many different ways in the opinions of this court. See cases listed in Caldwell's Judicial Dictionary and supplement thereto under the heading, "scintilla." The most usual method of reference is that if there is "any" evidence sustaining the plaintiff's case it must be submitted to the jury.

Departing from the original meaning of "the slightest particle or trace," there has finally been evolved in our court the definition of a scintilla of evidence as "something of substance, and not mere vague, uncertain, or irrelevant matter, not carrying the quality of proof, or having fitness to induce conviction." Park Circuit & Realty Co. v. Ringo's Guardian, 242 Ky. 255, 46 S. W. (2d) 106, 109; Duff v. May et al., 245 Ky. 709, 54 S. W. (2d) 4; Crump v. Chenault, 154 Ky. 187, 156 S. W. 1053. It was observed in Wood v. Corcoran, Adm'r, 190 Ky. 621, 228 S. W. 32, that there had been a

marked tendency to enlarge the quantum of evidence necessary to constitute a scintilla and the court commented on the plainly discernible approach towards eventual abandonment of the rule. There the trial court directed a verdict, acting on the assumption (brought about this tendency) that the scintilla rule had been abandoned, at least to the extent of its application to the issue of mental capacity in will contests. So marked was this tendency that it caused the text writer in 64 C. J. 313, to observe that the meaning of the rule had been changed in Kentucky. Although the rule was one of practice it was held in Louisville & N. R. Co. v. Grant, 234 Ky. 276, 27 S. W. (2d) 980, that in an action where the Federal Employers' Liability Act, 45 U. S. C. A., Section 51 et seq., was applicable the federal rule and not the scintilla rule would be applied. These inroads on, and modifications of the rule were, of course, brought about by the incongruity of the rule itself and manifested the court's realization of its illogicality and the desire to rule logically within the limits to which it was tethered by the rule.

However, as absurd as the rule may have seemed to many courts and the profession generally, there was in our state until recently, a bulwark behind it furnishing a semblance of reason for its retention and rendering it less incongruous than it was in those jurisdictions in which it prevailed and in which that bulwark was absent. We refer to section 341 of the Civil Code of Practice, repealed in 1936, Acts 1936, c. 27, which prohibited the granting of more than two new trials because the verdict was not sustained by the evidence. By virtue of that section, a party might by sheer persistence, aided by faulty functioning of the jury system, emerge victor in a case he should not have won. Judicial history reveals that such a victory was sometimes accomplished.

With the repeal of Section 341, the only bulwark behind the rule was removed. The court could now grant a new trial as often as such action was necessary to prevent a plainly manifest miscarriage of justice. As long as this legislative fiat was in existence, the court asquiesced therein and its constitutionality seems not to have been questioned. The repeal of that section amounts to almost an open invitation or mandate to abolish the scintilla rule which received its sole support therefrom. The doctrine of stare decisis is not a barrier since the rule is one of practice. No property rights

have been acquired in reliance on the rule and none are endangered.

Its abolition indicates no desire on the part of the court to invade the province of the jury. That a deep and abiding respect for the jury system is firmly engrained in our courts and that there has never existed a desire on the part of the courts to constitute themselves triers of fact to the exclusion of the jury is readily ascertained by a reference to the hundreds of decisions of this court denying reversals sought on the ground that the verdict was flagrantly against the evidence in which it was intimated, and sometimes expressly stated, that the court felt that the verdict was against the weight of the evidence and that injustice had been done. The Court, not being certain of its ground, preferred to let the apprehended injustice stand rather than encroach on the province of the jury. Although a literal and legitimate construction of the Code provisions appeared to authorize the setting aside of verdicts as being merely against the weight of the evidence (since those provisions authorized the granting of new trials on the ground that "the verdict is not sustained by the evidence"), it has only been where the verdict was flagrantly or palpably against the evidence, or, as sometimes said, so flagrantly against the evidence as to indicate that it was reached as a result of passion or prejudice on the part of the jury that the court would set it aside. Notwithstanding this settled policy, however, there has been no tendency to shirk the duty of setting aside the verdict in a proper case although there may have been a scintilla of evidence requiring submission to the jury.

But the gap between the quantum of evidence necessary to constitute a scintilla and that requisite to sustain a verdict has been gradually narrowed as a result of the previously mentioned tendency to enlarge the quantum necessary to constitute a scintilla. Such narrowing of the gap has not resulted from enlarging the quantum requisite to sustain verdicts. That quantum is, and should continue to be—as it has always been—the trust and confidence reposed by our citizenship in the efficacy and safety of the jury system demands it.

The closing of the gap by abolition of the scintilla rule will tend to bring an earlier end to litigation, will be promotive of mental sincerity on the part of the courts

and will bring us into harmony with the almost unanimous rule. Where not positively prohibited by public policy or other mandate, it is incumbent on us, especially since the epochal decision of the Supreme Court in Erie Railroad Co. v. Tompkins, 304 U. S. 64, 58 S. Ct. 817, 82 L. Ed. 1188, 114 A. L. R. 1487, to bring about this harmonization by discarding those doctrines that will not stand the test of careful analysis, no matter of how long standing or how many times adhered to. See Burlew v. Fidelity & Casualty Co. of New York et al., 276 Ky. 132, 122 S. W. (2d) 990, 121 A. L. R. 751.

As a consequence of the conclusion we have reached, the opinions in the cases of Thompson v. Thompson, supra, Buford v. Louisville & N. R. Co., supra, and all others following the rule of practice therein established, known as the scintilla rule, are hereby expressly overruled to that extent.

For future guidance, the rule of practice replacing the scintilla rule is declared in the following terms, namely:

"When the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but should direct a verdict for the defendant."

See Delk v. St. Louis & S. F. R. R. Co., 220 U. S. 580, 31 S. Ct. 617, 620, 55 L. Ed. 590, opinion by Mr. Justice Harlan. In the application of this rule it must be borne in mind that a verdict is set aside on the ground that it is not sustained by the evidence only when it is "palpably" or "flagrantly" against the evidence, or as sometimes said by this court "so flagrantly against the evidence as to indicate that it was reached as a result of passion or prejudice on the part of the jury." The gauge for this determination continues to be, of course, the decisions of this court in which that ground for reversal was raised and discussed.

In view of the conclusions enunciated, the judgment is affirmed.

The whole court sitting.