## Igo et al. v. Smith.

March 15, 1940.

S. M. Ward, Judge.

Keenon & Kessinger for appellants.

J. B. Eversole for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

Appellee was injured on the night of November 19, 1937, by being struck by a taxi owned by appellant and driven by Hubert Benton; these two with the "Igo Taxi" (trade name) were joined as defendants.

He asserts in the pleading that at the time mentioned he was walking along Highway No. 15, near Cor-

nett Hill in Perry County, "on the left side of the highway facing the traffic, and that Hubert Benton came along * * * driving the taxi going south, the same direction in which plaintiff was walking, and overtook and approached plaintiff from the rear," and in a reckless and negligent manner ran over and against plaintiff, knocking him down. The impact knocked him unconscious, "and left him on the highway with a broken jaw, teeth dislocated, leg broken between the knee and hip, and severely shocked and bruised him about the head and body."

His plea of general negligence was not transformed into special plea, by the descriptive words later used. He was taken to the hospital where he remained unconscious for some time; he says after his consciousness returned he suffered great pain; he has been unable to walk; his injury was permanent; that his hospital and medical bills amounted to $550, for which he asked judgment, in addition to $10,000 for pain, suffering and permanent disability.

A denial, plea of contributory negligence, and reply to appellant's answer completed the pleadings. Upon a hearing of the case a jury returned a verdict for plaintiff in the sum of $2,000; judgment was entered after a motion for a new trial was overruled in conformity with the verdict, and appeal is prosecuted.

Numerous grounds were set out in support of the motion for a new trial, but on appeal counsel for appellant urges the following:

(a) The court erred in permitting witnesses to testify as to points and objects from and by means of a diagram drawn by plaintiff's counsel on the court room floor, and in admitting incompetent, and rejecting competent evidence.

(b) The court erred in overruling defendant's motion for a peremptory instruction made at the close of all evidence.

(c) The court erred in the giving of and refusal to give certain instructions.

(d) The verdict is against the law and evidence and is excessive, being the result of passion and prejudice.

At the outset we must admit that the fact that a diagram was drawn on the floor, and to which witnesses referred in pointing out objects, distances and the lay of the road, with the usual expressions, "here" and "there," and "right about here," makes it difficult for us to grasp the situation. Again, the witnesses testified in such general and uncertain manner as to increase, rather than eliminate, the confusion.

After piecing together the portions of testimony of various witnesses, we are venturing to say that the accident occurred somewhere on Cornett's hill, between the bottom of the hill where there is a state garage, and the top of the hill, where there is a filling station. Between the two points the highway is straight for a distance of 300 yards; the highway is concrete, 24 feet wide, the shoulders at some points being 2 feet, and at others a lesser width.

Appellee lived at the lower end of the hill near the state garage, which he pointed out as he did the Cornett house, and said "here" and "there," marking these and other objects with a piece of crayon, and similarly illustrating the way he came from his home and got on the highway. He was operator of a motor in a mine, working on a night shift. He had been to Glowmar during the day and came home around two o'clock; laid down and slept until about 6:30, when he started up the hill "to the bridge to get some groceries." As he went up the highway, he says he walked on the left side of the marked center line of the highway. He does not say how far up the hill he had gotten, "walking along singing," when a car passed him going toward Hazard, and "somewhere around a minute something hit me in the back, and that was all I knowed." He described his injuries, and said that by reason of same he had been unable to work up to the time of the trial (May 13, 1938) and because of injury to his teeth and "no-account leg, he could not pass the examination."

On cross-examination he said he was "doing some farm work on two and a half acres, but I can't work much." He denied that he had taken a drink of whisky during the day, but up to two o'clock had taken, perhaps, as many as six bottles of beer, though he says he was sober. He also knew that there was considerable travel over the highway. He admits that the shoulders

of the highway were about 2 feet wide, but he says he was walking on the concrete on the left side. He did not know what struck him, or, if it were an automobile, who was driving; he later learned that Hubert Benton was driving it. There is no dispute on this point.

Fred Davis lived in the neighborhood of appellee. On the day of the accident he was down near the garage, and had started up the hill; he describes the accident as he saw it:

> "Well, I seen a car go around another car, which was going down the road, and it was on the left side of the road going up, and as he went around there I seen him hit Taylor Smith, but I didn't know at the time who it was."

He did not then go to the scene of the accident, but says: "he was picked up before I could even get there." He later went to the scene of the accident. He testified:

> "Well, where he was hit, from where he was hit was about 2 feet from the center of the road and it went about 12 to 15 feet I guess, to the left, on the left-hand side as you go up, and this blood was strung along the side or the middle of the left-hand side of the line."

On cross-examination this witness said he was "at the garage, and about 300 feet or better" from the point where the accident happened. He also said it was dark. He saw the car which had passed Smith going north, and then saw the other car going south, and which was the one which struck Smith. He saw Smith about 2 feet from the center of the road. The car going north had its lights burning. The driver of the Igo car was just pulling around this other car and ran into Smith. The Igo car, driven by Benton, was on its right side of the road. Witness was then asked: "How long had that car passed Mr. Smith before the accident?" He answered: "I don't know, it was dark after the first car passed; I don't know what happened after that." He says he didn't see Smith until the other car, which was coming up, hit him. "The other car that was coming down was on the right side. When he passed the fellow it was dark and when the other fellow's headlights hit him I could see and after the car hit him I don't know what happened."

He then says, though it is difficult to understand the situation:

"This car that was coming down was aiming to turn over this hill that ran down in the bottom and he was aiming to turn out of the road so he had to pull over and so he had to or he passed him and went around him and the other car was setting still on the side of the road and he went around him. At the time he went around him he hit Taylor Smith."

He further said:

"The car coming down stopped between him and the point of the accident, over on the left side going up the road. The car that had passed Smith was turning into that side road down into the vilage." He then takes his crayon and illustrates by marks.

Karl Evans, witness for defendant, was the man in the other car. He was driving toward Hazard on Highway No. 15. He saw Smith before he was struck. He was going up the highway "all over it, first on one side and then on the other; staggering ever once in a while. When I saw him he acted like he had been drinking. I slowed up, and cut over on the shoulder of the highway. I pulled two wheels off the concrete over on the shoulder. I drove on a little piece where I was going to turn off. I didn't quite get to this other car, the taxi that was coming up the hill. I drove slowly. I stopped and stuck my head out of the window to see how he was going to get by this car, and the car hit him. I had only traveled 50 or 75 feet. I stopped on the right." He said the taxi going south was on its right side. When asked what he did after the taxi passed, he said:

"Well, I stuck my head out the window and was watching the boy to see how he was going to get by, he kept bearing to the right by the side of the taxi that was coming up on him and I saw the car hit him and it knocked him over on the left side of the road. * * * I got out and went back up there to him. By that time the boy had stopped there to see and I told them to come back * * * that they had killed a man. They come back down there

* * * and we loaded him in the taxi and they brought him down to the hospital."

This witness when asked, "Which side of the road was he on when you first saw him?" replied, "His left side, headed south. * * * Bearing back over to the right. The taxi was on its right side when it hit him."

Harold Dunnigan was in the Benton car. They passed another car just before the accident happened; it was headed toward Hazard. The taxi was on its right side, going twenty-five miles. He then saw Taylor Smith "at about the black line, right in the center of the road. He took a backward step into the car that was driven by Benton. Benton cut his car to the right to try to keep from hitting him, and the front fender hit him. Benton drove 25 to 30 feet and stopped. We went back as quick as we could." On cross-examination he says that he saw Smith "as soon as the light hit him, and his car was about 10 feet away." He said that in order to pass Smith, Benton would have had to pull his car off the pavement. He also says that the Evans car did not turn into a driveway. Upon examination of the car which Benton was driving, it was shown that the left fender was bent "about half way back upon top of the wheel."

We agree with counsel for appellant that a map or plat should have accompanied the transcript in this case. Of course, it is impossible for parties to get into the record a plat that is drawn with crayon on the floor of the court room, and a trial court should not permit this to be done, unless a facsimile be drawn and filed with the record. Counsel for appellee said, if given time he was "going to try to get it into the record," but for some unexplained reason made no effort. It is no excuse for counsel to say that the map was made on the floor "only for purpose of saving the commonwealth the expense of sending the jurors to the scene." Had they gone it would have been little help to this court. The expense of making a drawing, which would have been of some benefit to this court, would have entailed little expense.

Under subsection 11, Rule 3 of this court, "maps or diagrams used at the trial of a case must be made part of the record and brought to this court. A failure

to observe this rule will be visited with such penalty in each case as the court may deem proper." The attention of the bar was called to the importance of this rule in Burchett v. Leslie, 186 Ky. 361, 216 S. W. 850. See, also, Fyffe v. Com., 256 Ky. 145, 75 S. W. (2d) 778, and cases cited; Conley v. Com., 208 Ky. 538, 271 S. W. 566, 567. In that case we said:

> "When upon the trial of a case, either party offers to introduce a plat, the court should refuse to allow the plat to be used until it is filed."

Regardless of the rule cited above, and our power to visit penalty for a failure to observe it, the lower court should follow the suggestions laid down in the cases cited, so as to relieve us of the necessity of penalizing either party to an appeal. Here it would be awkward to penalize appellant because of a failure, since the map was drawn on the floor, and we could hardly go to the extent of reversing because appellee failed to file the map or a copy. The most we could do would be to strike all evidence wherein the map was used in reference, but from our review of the case and conclusions, this does not appear to be necessary.

Taking up now the chief controversial points, we are of the opinion that appellant's contention that he was entitled to a directed verdict at the close of appellee's testimony, and again at the close of all the evidence, presents a close question. However, we think there was sufficient evidence to carry the case to the jury, notwithstanding we have lately abrogated the long-standing scintilla rule. See Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877, 883. In that case in stating the rule to be hereafter followed, we said:

> "When the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but should direct a verdict for the defendant."

The converse of the rule would be to say that if the evidence at the trial, with all inferences that the jury could justifiably draw, is sufficient to support the verdict, then the court should submit.

The theory of defense seems to be that under all the facts and circumstances, Smith was guilty of contributory negligence in traveling as he admittedly did. The fact that Smith was proceeding along the highway as he and others say he was, does not make him, as a matter of law, guilty of contributory negligence. In the absence of a statute making the rule otherwise, pedestrians and operators of motor cars have equal rights in the use of the highway; each must recognize the right of the other and exercise reasonable care to avoid injuring the one, or of being injured himself. Pryor's Adm'r v. Otter, 268 Ky. 602, 105 S. W. (2d) 564. Ordinary care, as applied to the operator of a motor vehicle, is of higher degree than ordinary care as the term is applied to pedestrians. Jackson's Adm'r v. Rose, 239 Ky. 754, 40 S. W. (2d) 343.

So, the appellee in this case was not to be charged with contributory negligence, as a matter of law, but it was proper to submit to the jury the question as to whether or not he was guilty of negligence under all the facts and circumstances, and under all the proof. Appellee's testimony, it is true, does not fasten on appellants any particularly negligent act of the driver of the Igo car. However, though the testimony of the Davis boy may not be of great probative value, and there were some apparent contradictions, there was included in his testimony proof of a situation from which the jury might do more than infer negligence. He does say that the driver of the Igo car, in attempting to pass the car which evidently was driven by Evans, pulled his car to the left of the center of the road. Evans says he was at one time making the turn, but it was after he had passed the Benton car.

It is true that this witness in a measure gives different versions as to just how the accident happened, or as to the situation of the two cars just before and at the time of the accident, and this fact lessens the probative value of his testimony. However, his testimony was not impeached, and, taking it for what it is worth, the jury was the sole judge of the weight.

Evans' testimony was favorable to the defendant, but on cross-examination he was not so strong. He said, "I pulled over to get by the boy (evidently Smith) and

cut over on the shoulder and just let it go slow before I had to turn off and kept going on. The only thing that attracted my attention was whether it would pass the boy or not. I couldn't swear whether he (Smith) was on the right side or not, but I a little bit believe he was on the right side." The blood he saw, after going back, was on the left hand side, "I didn't see any at the center." He only drove a few feet past Smith.

The foregoing is a fair statement of the salient parts of the testimony, and, as said before, we think there was enough evidence to take the case to the jury, and, though very close, and somewhat conflicting, sufficient to justify a verdict for plaintiff. If the testimony of Dunnigan be accepted as true, in part, then Benton was driving his car on a straightaway, with lights burning, and, as is shown, at a reasonable rate of speed; under all circumstances and conditions, there may have been negligence.

As we view Dunnigan's testimony, it presents a case where (though not clear) Smith was in a place of safety, just before Benton came up with him, and stepped into the path of the car. The fact that the only mark on the car was a dent in the left fender, just over the left front wheel, might indicate that such was the case, but the same might have been the result, if in fact the Benton car was attempting to pass Smith and veered to the right. However, we need not further discuss questions of fact, since there are errors in the instructions which we think require a reversal of the judgment.

In Instruction No. 1, after the giving in part what appears to be a fairly well-framed instruction on the duty of the driver of the Benton car, and a general duty to observe ordinary care, so as to prevent injury to any person on the highway, the court added:

"If the plaintiff Taylor Smith was in a drunken condition and traveling upon the highway, and this was observed and known by the driver of the taxi; or if the driver of the taxi saw there was danger of the taxi striking and injuring plaintiff, it then became the duty of the driver of the taxi to use ordinary care in the use of every means at his command to avoid striking or injuring the plaintiff."

In part the instruction is erroneous, because there

is no proof in the record that Benton knew of or observed the alleged drunken condition of Smith. The witness, who was riding with Benton, makes no mention of any fact which would have indicated to him that Smith was in a drunken condition, and Benton was not present at the trial to give testimony. Even were it otherwise, such a situation would be taken care of in an instruction later suggested.

Instruction No. 2, as given by the court, is in part erroneous. The jury was told that "it was the duty of Smith, before entering upon the main traveled portion of the highway, to look in both directions to see if an automobile was approaching, and it was his duty to use ordinary care, that is, the care which an ordinarily prudent person of like age and experience would use under similar circumstances, for his protection and safety."

There is no proof that Smith was entering upon the main traveled portion of the highway. The use of the words "entering upon" might have been misleading to the jury, in that they might conceive that Benton owed no duty unless Smith was entering upon the highway.

The instruction should have submitted to the jury the plaintiff's duty while traveling upon the highway, omitting the words "to look in both directions to see if a car was approaching." His only duty was to exercise the common-law duty of exercising ordinary care for his own safety. Whether such duty requires him to learn of the approach of an automobile and keep out of its way, or use greater or lesser diligence, is a question for the jury. Wheeler's Adm'r v. Sullivan's Adm'r, 260 Ky. 814, 86 S. W. (2d) 1023.

The sudden appearance, or last clear chance instruction, is given in different form in both instructions 1 and 5, the former defining the duties of the driver of the car, and in the latter in the form of sudden appearance. On another trial it would be a better form to define "ordinary care," and to couple the discovery of peril instruction with the instruction defining the duties of the plaintiff, as is particularly laid down as the correct form in Dixon v. Stringer, 277 Ky. 347, 349, 126 S. W. (2d) 448, 452. In that case we said:

"We have reached the conclusion that there is no necessity or reason for giving an independent in-

struction of the 'sudden appearance' type in an action of this kind, since voluntary action on the part of the pedestrian by which he gets into the path of a moving car may be properly covered by an instruction on contributory negligence, if there be such a plea."

We suggest, as was done in the Dixon case, supra, that the form given therein should be substantially followed. We have not undertaken to pass on other grounds for reversal discussed in the briefs, and such are reserved; the judgment is reversed, with directions to award appellant a new trial consistent herewith.

Judgment reversed.