# Burk Hollow Coal Co. v. McCulley's Adm'r.

April 24, 1942.

Henry C. Gillis for appellant.

L. O. Siler, J. B. Johnson and Joe S. Feather for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Reversing.

This action was filed by the appellee to recover damages for the wrongful death of his decedent, an experienced miner 50 years of age, alleged to have resulted from breathing bad air in appellant's mine. Verdict and judgment were for $2,000, followed by this appeal.

First of the numerous grounds urged for reversal is that the trial court erred in refusing to direct a verdict for appellant. Appellant did not have in its employ a mine foreman holding a certificate of competency as re-

quired by Kentucky Statutes, Section 2739-42, nor did it have its mines equipped with mechanically operated ventilating fans as required by Section 2739-19. However, the mine had what is known as natural ventilation, that is, the entry was cut through the mountain from one side to the other, thus permitting the natural circulation of air.

At the time in controversy the decedent and another miner were assigned to the task of clearing out a room-neck which had been partially blocked by slate. The room was one in which no work had been done for some-time. After the slate had been removed from the room-neck, the miner working with the decedent was sent to another working place in the mine and at that time the decedent was pulling rails into the room-neck for the purpose of laying a track. A short while thereafter (there is some conflict as to whether this period of time was forty minutes or two hours) the decedent came to the place where a miner, Gilbert Hyslope, was working and said to him, "I am drunk but not on whisky." The decedent sat down while Hyslope made preparations to take him out of the mine. When Hyslope was ready the decedent got up but staggered and fell. Hyslope then noticed that his right side was paralyzed and his mouth drawn. Other witnesses testified that at this time the decedent breathed hard, was pale and nauseated and that a white foam ran out of his mouth. He was removed to his home and died five days later. The company doctor attended him and two other physicians were called in at the request of the family. These three physicians, all of whom testified for appellant, agreed that the cause of death was cerebral hemorrhage, accompanied by complete paralysis of one side. The company physician testified that about three weeks previously he treated the decedent for acute alcoholism and that he was then in a critical condition. He also testified that the cerebral hemorrhage was due to high blood pressure resulting from Bright's disease.

Appellant insists that the decedent was not assigned to work in the room but only to clean out the room-neck and argues that there was no competent evidence that he actually worked in the room. However, we think the circumstances proven were sufficient to justify the inference that he was working in the room when stricken. There was evidence that rails had been laid about forty feet

into the room and he was last seen pulling rails into the room-neck. Also, he wanted Hyslope to fix a shot for him to shoot a wet hole and a hole was found with ten or twelve gallons of water in and around it, this hole being well into the room and near the face of the coal. It might here be added that this was the only evidence as to water or dampness in the room, although much stress is laid on the accumulation of stagnant water in the room by counsel for appellee.

One witness testified that he was in the room the next day after the decedent was stricken and that he became sick. He said, "I got sick. In other words, drunk in my head and sick in my stomach." However, he said he could not say whether the air was good or bad. This witness also stated that he was ordered to cut a break-through in the room that day, apparently to permit more air circulation. The evidence shows that there was one break-through already cut.

Two physicians and two experienced miners testified for appellee as expert witnesses as to the effects of bad air. The miners' testimony was directed only to proving that bad air accumulates in a room such as the one in controversy was described to be by witnesses and the symptoms exhibited by miners made sick by breathing bad air, which, in general, were the same as those exhibited by the deceased, with the exception of the paralysis. But to the two medical witnesses was propounded a hypothetical question, in answer to which they expressed the opinion that the decedent's death was caused by breathing bad air. This question possessed the vice of assuming unproven facts and of distorting and exaggerating some facts sustained by evidence tending to establish their existence. We point only to a few such instances and refrain from quoting the question since it was quite long. First, the question assumed that "muck" was accumulated in the room-neck. There was no such evidence, it being shown merely that the neck was filled with slate. "Muck" implies foulness, dirtiness, dampness and slime and the erroneous assumption that such a condition existed in the room-neck had a material bearing in inducing belief as to the existence of bad air in the room. Secondly, it was assumed that there was *no* ventilation or currents of air passing through the room. There was no proof as to complete lack of ventilation and the question of circulation of air in the room

was one of the main issues in the case. Third, it was assumed that other *miners* were taken sick in the room on the following day. The only evidence was that one miner was thus affected. This was highly improper. The witnesses to whom the question was propounded may have assumed, and would have been justified in the assumption, that a large number of miners became sick in the same room the next day. Obviously, such assumption was bound to have a material effect on their opinion.

However, even though the hypothetical question had been framed so as to eliminate the objectionable features, it is our conclusion that an opinion expressed by the physician, based on the meager foundation of such facts as appellee's evidence tended to establish arose to the dignity of no more than a mere scintilla of evidence, in view of uncontroverted evidence of the three physicians who attended the deceased that death was due to cerebral hemorrhage. And it may here be pointed out that the hypothetical question did not inform the physicians to whom it was propounded of the diagnosis made by the attending physicians.

We have many times said that expert testimony of the character under consideration is the weakest character of testimony and entitled to but little weight. Strode v. Strode, 194 Ky. 665, 240 S. W. 368, 27 A. L. R. 313; Louisville & N. R. Co. v. Rowland's Adm'r, 227 Ky. 841, 14 S. W. (2d) 174; Prudential Insurance Company of America v. Howard's Assignee, 258 Ky. 366, 80 S. W. (2d) 21. Especially is that true as to the testimony of appellee's medical witnesses based on the meager proven facts incorporated in the hypothetical question without even having imparted to them the definitely proven cause of the decedent's death.

It was incumbent on appellee, in making a case for the jury, to prove 1) appellant's negligence in failing to provide ventilating facilities and adequate inspection, 2) that such negligence resulted in improper or inadequate ventilation, 3) that such inadequate ventilation resulted in bad air in the room where the deceased was working, and 4) that the deceased came to his death as a result of breathing this bad air. Only the first of these essentials was proven. No witness testified that there was any lack of air in the room—the jury was called on to indulge this inference only from a lack of ventilating

facilities which might have resulted in this condition. No witness testified that the air in the room was foul or bad. The expert witnesses (and the jury) were called on to indulge this inference from certain proven conditions and from the fact that one man got sick in the room on the following day, a man who did not know whether or not the air was bad and whose illness may have resulted from any one of many different causes. Then, having based the inference of bad air on the possibility or probability that it existed, expert witnesses (and the jury) were called on to pile inference upon inference by inferring that the decedent's death resulted from breathing bad air—all this because bad air might have existed and because another man in addition to the decedent was taken sick in the room.

Another reason confirming us in our conclusion as to the worthlessness of the opinions expressed by the physicians testifying as experts is that they testified that the breathing of carbon monoxide (which is the kind of bad air they assumed to exist) does not cause "true paralysis." The hypothetical question propounded to them wholly omitted reference to cerebral hemorrhage and paralysis continuing until death (it was merely stated that "he had apparently lost the use of his right arm and leg" when he was removed from the room). Yet cerebral hemorrhage and true paralysis were incontrovertibly established by the attending physicians.

We have often written that speculation and supposition are insufficient to justify the submission of a case to the jury and that the question should be taken from the jury when the evidence is so unsatisfactory as to require a resort to surmise or speculation as to how an injury occurred. Hearell v. Illinois C. R. Co., 185 Ky. 41, 213 S. W. 561; Tolin v. Terrell, 133 Ky. 210, 117 S. W. 290; Louisville & N. R. Co. v. Mann's Adm'r, 227 Ky. 399, 13 S. W. (2d) 257. It is our conclusion that the evidence for appellee afforded no more than a surmise or speculation that the decedent died as the result of breathing bad air. At the most it amounted to no more than a scintilla which, under the rule announced in the case of Nugent et al. v. Nugent's Ex'r et al., 281 Ky. 263, 135 S. W. (2d) 877, was insufficient to justify a submission of the case to the jury. This being true, a verdict should have been directed for appellant.

Other grounds for reversal are urged which we do

not deem it necessary to consider in view of the conclusions announced. In any event, all questions not decided are reserved.

Judgment reversed with directions to grant the appellant a new trial and for further proceedings consistent with this opinion.