# Southeastern Greyhound Lines v. Sampson.

April 23, 1948.

R. W. Keenon and Roy E. Tooms for appellant.

Sampson B. Knuckles for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SIMS—
Reversing.

Appellee, Minnie Sampson, instituted this action to recover $2000 from appellant, Southeastern Greyhound Lines (hereinafter referred to as the Company). The petition alleged she suffered damages by reason of the Company negligently allowing its bus to become so cold that her feet were frostbitten while she was a passenger from Knoxville, Tenn., to Barbourville, Ky., on Feb. 5, 1947.

She obtained a verdict for $500 and to reverse the judgment entered thereon the Company insists that the court erred: 1. In refusing to direct a verdict in its favor; 2. in giving improper instructions and refusing to give proper instructions; 3. in permitting improper argument; 4. the verdict is excessive. As we think the first ground is meritorious, it will not be necessary to discuss the other three.

A brief resume of the evidence is in order. Mrs. Sampson and her husband resided at Scratch Ankle, which is located on a muddy and almost impassable road about a half mile from highway #25 in Knox County. On Feb. 3, 1947, Mr. and Mrs. Sampson walked something over a mile in cold weather to the station where they took a bus to Knoxville, where they were the guests

of his sister for a day or two. On Feb. 5th, the day they took a bus in Knoxville to return home, the mercury registered 22 degrees. Mrs. Sampson was wearing nylon hose and very thin kid slippers. She walked four and a half or five blocks to see a doctor and then three blocks to the station to get the bus to Barbourville.

The bus the Sampsons boarded in Knoxville about 2:00 o'clock on the afternoon of Feb. 5, 1947, was a new, 37 passenger vehicle, having been in service only since the latter part of December, 1946. It was air-conditioned and equipped with the latest type blower heater system controlled by a thermostat. The heat automatically came on when the temperature in the bus fell to 65 degrees and cut off at 72 degrees. This thermostat was located over the last cross, or aisle, seat in the rear of the bus, and there was a heater 4 by 10 inches in front of the long seat across the rear of the bus. A check of the bus by the driver is required before it starts on the run out of Knoxville and the driver testified that when he made this check, in taking charge of the bus, the heaters were working.

The bus was full and Mr. and Mrs. Sampson occupied the long seat which extends across the rear of the vehicle. Mrs. Sampson testified the bus was comfortable when she boarded it, but after traveling "a pretty good piece" cold air came in around her feet; that her feet got so cold she took off her shoes and doubled her feet up in the seat under her husband's overcoat. No other part of her body got cold. She testified her feet usually stay cold in the winter.

Mr. Sampson testified that when they had gone 30 or 40 miles out of Knoxville his wife complained to him that the bus was cold; pulled off her slippers, doubled one foot under her with the other foot between him and her which he covered with his overcoat. He felt a draft of cold air under the seat along the front.

Both Mr. and Mrs. Sampson admitted that neither of them complained to the driver or to any passenger on the bus that it was cold. Neither of them heard any passenger complain that the bus was cold; nor did the Sampsons change or attempt to change their seats when passengers left the bus at various stops between Knoxville and Barbourville.

Upon reaching Barbourville about 5:00 o'clock in the afternoon the Sampsons walked to a taxi stand and took a cab to the point where the dirt road from Scratch Ankle intersects the highway, as the cab could not traverse this road. They alighted therefrom and walked a half mile to their home. After reaching home Mr. Sampson built a fire so his wife could warm her feet before time to retire.

It was Wednesday evening when Mrs. Sampson returned home and she testified that on the following Saturday or Sunday her feet became sore, spots appeared on them and they ached whenever they came in contact with heat. She tried home remedies, one of which was turpentine, but her feet became worse and on March 5th (a month to the day after she made this bus trip) she visited Dr. T. R. Davies, who diagnosed her trouble as frostbitten feet.

The doctor testified he could not determine when Mrs. Sampson received this frostbite. On direct examination he was told that Mrs. Sampson said her feet began to ache and burn two days after her bus trip and he was asked if it were possible for this aching and burning to begin two days after the frostbite was received. He answered that it was possible, but usually the pain starts within a few hours after the victim comes in contact with normal temperature.

On cross-examination Dr. Davies was asked if Mrs. Sampson's feet did not indicate they had been frostbitten four or five days before he saw her, which was on March 5th and a month after the trip. He answered, "No, I couldn't say that. All I can say is that she had frostbitten feet." He was next asked if he thought her condition was the result of frostbite on Feb. 5th. He replied, "Well, I couldn't answer that question, because I couldn't state the exact time."

Dr. Davies admitted appellee's condition could have resulted from a frostbite which happened three, four or five days before he saw her. Mrs. Sampson testified that the weather was very cold between Feb. 5th and March 5th and there was snow on the ground almost all of that time. But she stated she was not out of the house for any length of time during that interim.

There is a conflict in appellee's evidence as to whether she wore galoshes in going from her home at Scratch Ankle to highway #25 on Feb. 3rd and in returning over this route on Feb. 5th. When first on the stand Mrs. Sampson stated she did not wear galoshes because she did not think she needed them. Also, her husband testified that while his wife had galoshes at home, she did not wear them, as did his mother with whom they made their home. Appellee was recalled and stated she wore galoshes on Feb. 3rd from her home to the highway, left them at Ernest Tuggles' store and on the return trip on Feb. 5th, she picked them up at the store and wore the galoshes home.

Under the peculiar facts presented in this record we are constrained to hold that at the conclusion of all the evidence the court should have sustained the Company's motion for a directed verdict. The uncontradicted evidence of the Company is that this was a new, air-conditioned and modern bus, equipped with the latest type of heaters controlled by a thermostat in the very part of the vehicle occupied by appellee. These heaters were inspected and found to be working when the bus started on this run. The driver was in his shirt sleeves and two passengers, drivers for another line, testified this bus was warm enough throughout the trip for them to be comfortable without their coats. Neither Mrs. Sampson nor her husband complained to the driver or to any passenger that the bus was cold; and on the entire trip they did not attempt to change their seats. Dr. Davies could not testify when Mrs. Sampson's feet were frostbitten, but did state it was possible for her to have suffered such a misfortune by wearing thin slippers and nylon hose without galoshes if she stayed out long enough when the thermometer registered 22 degrees.

Therefore, it is speculative as to when and where Mrs. Sampson's feet became frostbitten. Certainly, there is no definite evidence of probative value carrying the weight of conviction that she suffered her misfortune on the bus or that the Company was negligent in not properly heating the bus. City of Ashland v. Burley, 265 Ky. 176, 96 S. W. 2d 581. In the circumstances, we must hold that this verdict is flagrantly against the evidence. Since the decision in Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. 2d 877, the rule has been

that where we reverse a judgment because the verdict is flagrantly against the evidence, we hold there was not sufficient evidence to have taken the case to the jury.

The judgment is reversed with directions that upon another trial, should the evidence be substantially the same, the court will direct a verdict in favor of the Company at the conclusion of all the evidence. All other questions are expressly reserved.