## Thompson v. Shutz.

January 28, 1949.

Frank H. Dyer and Geo. B. Ryan for appellant.

William A. Coffee for appellee.

Opinion of the Court by Judge Thomas—Reversing.

Main Street in the city of Louisville runs east and west, whilst 8th Street runs north and south. At about 11:25 A. M. on April 8, 1942, appellee, Maurice A. Shutz, was traveling west on Main Street driving an automobile, and Albert Thompson, a resident of Trimble County, was walking north on the west side of 8th Street. Some distance west of the west boundary of 8th Street the automobile of appellee collided with the decedent, Albert Thompson, or he collided with it, and he was fatally injured.

About 100 feet west of Main Street, and on its north side, is located the business house of Fulton Conway who sold tools and other articles which Thompson used in operating his various avocations of carpentering, blacksmithing and cabinet making. Decedent had gone from his home in Bedford to obtain material from that store. At the time, and for some while before, a very heavy rain was falling. Decedent was picked up by appellee and some others and carried into the Conway store, but soon thereafter he was taken to General Hospital located about one mile from the scene of the accident where he lingered unconscious for three days and then died.

His widow, the appellant herein, qualified as administratrix of his estate and filed this action in the Jefferson circuit court on November 14, 1942, against appellee seeking to recover from him the sum of $7,500 as damages to the estate of the deceased. She alleged in her petition that appellee as he approached the intersection of the two streets was traveling at "a rapid, careless and reckless rate of speed," and "violently and negligently struck the decedent, Albert Thompson" from the effects of which his death occurred. Also that his death "was solely caused by and the result of the gross negligence of the defendant, Maurice A. Shutz, as above set forth," etc.

A short while after the accident appellee entered the armed services of the United States and was absent from his home for four years and at the time of the filing of the action he was so engaged in foreign fields. After his return in 1946 summons was served on him and in

due time he answered the petition, denying in general terms the affirmative allegations therein and plead contributory negligence on the part of the decedent. At the trial the court at the close of the testimony introduced by both sides sustained appellee's motion for a peremptory instruction followed by a verdict in accordance therewith and judgment dismissing the petition, from which plaintiff prosecutes this appeal.

Appellant's motion for a new trial contained five alleged separate grounds as errors, the first three of which, though repeated in different language, complained of the directed verdict given by the court. The fourth ground is alleged newly discovered evidence, and the fifth is "accident or surprize which ordinary prudence could not have guarded against." The combining of the first three had the effect of reducing the grounds to (a) error of the court in giving the peremptory instruction, (b) accident or surprize which ordinary prudence could not have guarded against, and (c) newly discovered evidence. They will be disposed of in the order named.

Only one eye witness gave testimony as to how the accident happened who was the defendant himself. The only witness introduced by plaintiff to show how the accident happened was a policeman, Charles Dalrymple, who arrived at the scene within "eight to ten minutes" after receiving notice of the accident. The hard rain was still falling and Thompson had then been carried by appellee and others into the store of Fulton Conway. Dalrymple made no inspection on that trip to ascertain the location of the collision, but after he and the others took Thompson to the General Hospital and had him admitted therein, witness returned to the scene while it was yet raining and at that time he testified that he discovered "a spot of blood just beyond the south rail of the east bound car track * * * approximately 7 or 8 feet" from the west boundary of 8th Street. The spot of blood, if any, to which he testified had remained on the street for some 15 or 20 minutes when he claims to have seen it, during all of which time a hard rain was falling. Ten minutes of that time was the period between the happening of the accident and when the witness arrived at the scene and the remaining part was the time consumed in taking Thompson to the hospital,

which, as we have said, is one mile away, and then returning to the scene. The size of the alleged spot of blood to which witness, Dalrymple, testified was not given.

Witness was further asked:

"Q. Did he (defendant) make any statements to you at the time? (our parenthesis) A. Told us how the accident happened—his version of it.

"Q. What was that version? A. That he was driving down west on Main Street in the car track; saw Mr. Thompson start across the street from south to north; he put on his brakes; as he attempted to leave the car track, it was raining rather hard at the time and his car swerved and the left rear side of the car hit Mr. Thompson; continued out of control to in front of 805 Main and struck a truck which was parked diagonally at the curb, doing $175.00 damage to the Chevrolet coach and approximately $15.00 damage to the truck. * * *

"Q. Now you stated that the pedestrian was headed north, toward the river? A. That is right. He was crossing from the south to the north.

"Q. Was he crossing in the crosswalk? A. He was."

Witness then testified that appellee told him at that time that he was traveling 25 miles per hour. He also testified that within an hour and a half after conveying Thompson to the hospital he made a report and stated therein that appellee was traveling "35 to 40" miles per hour which he stated "was our estimated speed," and not that which he claimed was given to him by appellee. On cross examination witness was asked, and answered:

"Q. Officer, of your own personal knowledge you know absolutely nothing about this accident; is that correct? A. Nothing except the damage to Mr. Maurice Shutz' car and what he told me.

"Q. Your report is made up from going over the physical signs of the accident and what someone else told you; is that correct? A. That is right."

Witness also testified that after delivering deceased

to the hospital he arrested appellee preferring a charge against him of recklss driving which was changed to one of voluntary manslaughter after Thompson's death, but appellee appears to have never been indicted for the latter offense and was never tried for reckless driving and each of those charges was based on no facts given by any eyewitness to the collision, but solely on what Dalrymple testified as hereinbefore narrated. The testimony of that witness was all that was introduced by *plaintiff* to show how the accident happened.

Defendant testified that he was 29 years of age and had recently been released from the military service. He was asked to tell how the accident occurred and gave this version:

"I was going west on Main Street, the morning of April 8th. I was traveling astraddle of the first car track from the curb, the south side curb. I passed Eighth Street and was about fifteen yards on the west side of Eighth Street when this man appeared to me in the street; he was too close to me to do anything else—it wouldn't have done me any good to stop; so, instead of trying to stop, which I most likely would have run over him, I cut my car as sharp as possible to the right to keep from hitting him, but due to the condition of the street, the wetness, etc., the car swerved at the rear, although I felt no impact on the car, and I continued across to the south side of the street and struck this farm truck. Not until I got out of the car did I see this man lying in the street that evidently walked into the side of my automobile; and at the time when I first noticed him it seemed like he was walking more on a 45 degree angle, with his head down—to keep the rain out of his eyes most likely.

"Q. Mr. Shutz, was it raining very hard? A. It was raining pretty hard at the time, yes sir.

"Q. You say you were in the westbound—A. I was going west; yes, sir.

"Q. Was there a line of traffic? A. I was traveling with a line of traffic which was going around the rate of 12 or 15 miles an hour. In bad weather that is fast enough.

"Q. Were cars in front of you and cars in back of

you? A. Yes, sir; cars in front of me and in back of me. It was fairly busy at the time—people going to dinner.

"Q. You say the first time you saw Mr. Thompson he was so close to you that you cut your car sharply to the right and ran into a parked car rather than strike Mr. Thompson? A. Yes, sir.

"Q. You say you were traveling between 12 and 15 miles an hour? A. Yes, sir; couldn't have been any faster, because the traffic was moving slow on account of bad weather. Plenty of traffic out that morning."

He then stated that when he saw decedent he was somewhere near the middle of Main Street traveling diagonally across it from the southwest corner of the intersection toward Fulton Conway's store with his head down and his hat brim pulled over his eyes, and there was then a line of traffic on both sides of the street which he concluded was due to the fact that the lunch hour was approaching. He also stated that he was on the lookout and that decedent appeared to emerge onto Main Street from behind a passing car traveling east on that street between it and the following car going in the same direction. He further stated that his automobile did not strike Thompson head on, but that he was struck by the rear end of his car which swerved somewhat to the left as he attempted to avoid striking him by sud-denly turning to his right.

No witness testified as to the injuries received by the deceased, except the statement of Dalrymple that there was a gash on some part of his head which he bandaged before taking him to the hospital. We there-fore do not know the extent of the fatal injuries or upon what part of the body they were inflicted, whether ex-ternally or internally. The trial court, therefore, was was confined in directing a verdict for defendant solely to the testimony given by appellee and that given by the policeman, Dalrymple.

Other witnesses in the case, including appellant and her two daughters, testified only to the earning capacity of the deceased, the avocations he followed and to his good health, and that given by the coroner as to the time of admission of deceased into the hospital, the date

of his death, and the report made of it, which witness said he filed with his testimony, but we fail to find it in the record; also that of another witness who measured the distance between Fulton Conway's store and the northwest corner of the intersection.

The major part of appellant's brief is devoted to the negligence of appellee in driving his car at the alleged excessive rate of speed of 25 miles per hour, as Dalrymple stated he had admitted, but which, as we have seen, was denied by appellee.

If appellee was traveling at a speed of 25 miles per hour—five miles in excess of the prescribed maximum rate—the effect would be to create a prima facie presumption of negligent driving. On the other hand, if the manner assumed by deceased while attempting to cross Main Street, as described by appellee, was true, it would tend to establish contributory negligence on his part, since under the law he was required to exercise such ordinary care for his own safety as a reasonably prudent person would do under the same or similar circumstances and conditions then prevailing. Since the rendition of the Nugent opinion (Nugent v. Nugent's Ex'r) 281 Ky. 263, 135 S. W. 2d 877, even if the testimony of the witness, Dalrymple, could be considered as creating a scintilla of evidence on the part of appellee, it then became the duty of the court to peremptorily direct a verdict for defendant.

Prior to the rendition of that opinion this court had approved the rule to submit the contested issues to the jury notwithstanding the evidence was such that a verdict based thereon would be so flagrantly against the evidence as to indicate passion and prejudice on the part of the jury and to direct a reversal of the judgment for a new trial. That rule has long since been discarded by the Federal courts and by a majority of state courts, since a new trial might result in the same verdict based upon insufficient evidence to support it, which might continue under that rule of practice indefinitely. In such situations the Federal court and a majority of state courts hold that the proper practice is for the trial court to direct the jury to return a verdict for the opposing litigants against whom the verdict was returned.

.The alleged accident and surprise complained of in ground (4) as contained in the motion for a new trial is "That witness, Ray Cheser, subpoenaed by the plaintiff appeared in Court not in proper physical condition, and was unable to appear to properly testify and could have rebutted testimony of defendant; that neither plaintiff nor her counsel were aware of said condition until the case had already proceeded to trial."

We do not find it in any other part of the record and the motion for a new trial, being the only place wherein it appears, was not verified. It is nowhere shown what the testimony of the witness would be if he had been able to testify, nor did counsel for appellant then move for a postponement of the trial until the witness was in condition to testify. Under the circumstances that ground is clearly unavailable.

Our ground (c) (newly discovered evidence) appears nowhere in the record, except in the unverified motion for a new trial as ground (4) and as therein contained, it is:

"Newly discovered evidence. Wherein it was discovered after the trial that a witness, George Eaton, subpoenaed by the plaintiff and out of the county on the day of trial, and reported to be in Monticello, Wayne County, Kentucky, and now served, was an eye witness to said accident and could have testified on behalf of the plaintiff and could have proved negligence on the part of the defendant. That said witness, George Eaton, was unable to be contacted by plaintiff and plaintiff or her attorneys did not have sufficient knowledge or any knowledge of the extent of said witness' testimony at the time of trial to be able to make an affidavit to such an extent and require a continuance in the case. Nor could plaintiff or her counsel by due diligence discover this extent of the witness' testimony and such extent was discovered immediately after the trial only by accident from Police Officer Dalrymple."

It is therefore apparent that this ground is unavailable. No affidavit was made in support of it, nor what the testimony of the alleged discovered witness would be, which renders further discussion of it unnecessary.

From the foregoing it will be seen that the testimony on the issue of negligent driving on the part of

defendant consisted in the testimony of Dalrymple as to the place where he found the spot of blood in the street, and the admission by appellee that he was traveling at the time, under the prevailing conditions, at 25 miles per hour, which it is shown was beyond the speed limit prescribed for such places, and which we have held in many cases, with none to the contrary, creates a prima facie presumption of negligent operation by the driver of the colliding vehicle.

That presumption is more or less corroborated herein by the distance traveled by defendant, Shutz, after becoming aware that he had collided with the deceased, and stopping only by his colliding with the stationary truck in front of the Fulton Conway store by which his automobile and the truck were each damaged.

Also there is sufficient evidence, as given by defendant, of negligence on the part of the deceased in failing to observe the duties of a pedestrian in crossing the street wherein he failed to exercise such care as an ordinarily prudent person would under the same or similar circumstances.

It is our conclusion, after a reconsideration of the case upon petition for rehearing filed by appellant's counsel, that the testimony on both the issues of negligence on the part of defendant, and contributory negligence on the part of the deceased is of sufficient probative effect to sustain a finding by the jury either way and a verdict returned for either litigant would be sustained as not coming within the rule announced and approved in the Nugent opinion. Therefore, such issues under the evidence in this case should each be submitted to the jury under appropriate instructions defining the duties as applicable to each of them under all the evidence adduced in order that the jury might determine which one of the immediate parties to the collision was at fault and was therefore responsible for the collision. See Stanley on Instructions and Supplement, sec. 98, page 96 of original edition, and page 17 of supplement, defining their respective duties, and also domestic cases cited in support thereof.

Wherefore, the judgment is reversed with directions to set it aside and for proceedings consistent with this opinion.