## Morehead & North Fork R. Co. v. Crawford.

Feb. 11, 1944.

Robt. H. Winn, Lester Hogge and James C. Clay for appellant.

J. H. Powers for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant, and defendant below, Morehead & North Fork Railroad Company, is a corporation organized for the purpose of constructing a railroad from Morehead, Kentucky, eastward, and which it completed and commenced its operation in 1906. Its primary purpose was to provide transportation for accessible timber along its line, which became practically finished some time before the year 1939, and operation of the road was partially abandoned after which the matters herein complained of occurred. However, the operation of the road was not abandoned between Morehead and the Lee Clay Products Company plant, a corporation organized for the purpose of mining clay, with its mineral rights and plant located adjacent to or near the right-of-way and tracks of appellant some few miles east of Morehead. That small section of defendant's track continued to be operated after the abandonment referred to but only for the purpose of serving the Lee Clay Products Company in marketing its produce and other needed purposes. The Products Company itself constructed a spur track leading from the main line of appellant to its plant, or tipple. Adjoining the land from which it obtained clay the appellee, and plaintiff below, Leroy Crawford, purchased the surface of a small area of land (quantity not being shown) extending from a more or less small stream up the steep hill or mountain side to its top and possibly beyond.

It also appears that the Products Company owned the clay mining privileges under the tract plaintiff purchased which was known as the Carpenter tract. A contract was entered into between plaintiff and the Products Company whereby the latter was given the privilege to dump upon plaintiff's surface all the strippage made necessary to obtain the clay from the land of the Clay Products Company as well as that underlying the Carpenter tract purchased by plaintiff and in which contract the Products Company paid plaintiff the sum of $50, the contract reading: "Now, Roy Crawford agrees to accept payment of Fifty Dollars ($50.00) and allow all spill stripped from the above two tracts mentioned to be dumped on his property as a result of the stripping operation now carried on by Lee Clay Products Company; and this amount (Fifty dollars) paid in hand is to take care of all damage now or in the future, for any and all spillage dumped on his property from either or both of the above tracts by Lee Clay Products Company."

While no date is attached to it the officers' certificate of acknowledgment bears the date of May 25, 1938. After that contract, dirt, rock and other refuse was dumped on the hillside of plaintiff's surface ownership in considerable quantities and in such fashion as to cause it to wash down the hillside into the branch below during the wet season. Plaintiff constructed a small residence about 100 feet from the branch in the valley and possibly a like distance from defendant's right-of-way, but which was a part of the abandoned track, the Clay Products' plant being located in the opposite direction nearer to Morehead.

On April 10, 1942, plaintiff filed this action in the Rowan circuit court against defendant in which he alleged in substance that the culvert under defendant's track adjacent to his residence was insufficient to carry away the water that flowed through the branch, and that it had neglected to keep the culvert clear of dirt, stone and rubbish, whereby it became partly obstructed so as to prevent the flowing of water to its full capacity if kept clean. He then averred that by reason thereof his premises became overflowed to the extent of entering his residence six feet above the floor, thereby damaging or destroying his furniture, and a garden between his residence and the branch, and lifting the house from its

foundation, whereby he was damaged in the total sum of $1,900 for which amount he asked judgment.

The answer denied the material averments of the petition and affirmatively pleaded (a) that the accumulation of the obstruction of the culvert under its track, of which complaint was made in the petition, was due to the washing of the dumpage and waste which plaintiff under the contract, supra, agreed and consented to, which was so deposited as to produce that result, and (b) that the particular rainfall flooding defendant's residence was an excessive and unusual rain in that community and, in fact, a local cloudburst, which it was not required to anticipate or prepare against. Following pleadings made the issues and upon trial before a jury it returned a verdict in plaintiff's favor for the sum of $500 upon which the court rendered judgment, and later overruled defendant's motion for a new trial, from which it prosecutes this appeal. A number of grounds are relied on in the motion for a new trial some of which are argued in brief of appellant, among which is, that the court erred in overruling defendant's motion for a peremptory instruction in its favor and, since we have concluded that the court should have sustained that motion, it becomes unnecessary to even refer to, much less discuss, the other argued grounds.

The culvert complained of is made of tile thirty inches in diameter in the clear, and it promptly carried away all water emptying into it from the branch up to about the year 1939 after the Products Company commenced dumping its strippings and refuse, under the privilege given it by the contract between it and plaintiff as set out above. The proof shows that there was a more or less sudden and heavy rain on July 4, 1939, when possibly the water got higher around plaintiff's premises than at any time prior thereto. In the meantime some old ties had been placed on defendant's right-of-way but they had been given to plaintiff by the president of defendant, ostensibly for fuel purposes; but whatever may have been his intention with reference thereto he permitted them to remain and unremoved from their location where they might be exposed to flood waters and washed away, thus removing any complaint on the part of plaintiff based upon their having been washed against the mouth of the culvert and thereby obstructing it. Likewise the proof shows that the debris from the dumpage made by the Products Company un-

der its contract with plaintiff washed down the side of the hill, or mountain, and was carried by the waters of the stream to the culvert whereby it became more or less obstructed at the time of the big flood of July 24, 1939, the results of which constitute the chief cause of complaint by plaintiff.

It is argued by counsel—based upon some evidence heard at the trial—that sometime before the complained of flooding of plaintiff's property the switch running from defendant's track to the Products Company plant was altered in such a way as to cause more water to run down the side of defendant's track next to plaintiff's residence, thereby increasing the quantity to pass through the culvert; but counsel for plaintiff in his brief truthfully appraised the situation, as developed by the testimony, thus: ''There is no claim made by the appellee that the water way, as constructed, is insufficient to carry off the water and that damage was the result thereof. The appellant claims that there is no liability on their part by reason of the fact that another corporation owns and operates a mine above the place where the damage was done. On the other hand it is the contention of the appellee that it is the duty of the Railroad company to keep the water way (culvert) open and that as the damage was due to the negligence of the railroad in placing ties where they could, and did, float down to the mouth of the water way and close the mouth of same, resulting in loss of the appellees' property the liability was created.''

It will thus be seen that the cause of action, if any, is based upon the contention that it was the duty of defendant ''to keep the water ways open and that as the damage was due to the negligence of the railroad in placing ties where they could, and did, float down to the mouth of the water way and close the mouth of same, resulting in loss of the appellee's property * * *.'' We have already seen that the ties of which complaint is made had been given and possession thereof turned over to plaintiff who permitted them to remain where the water might float them away and come in contact with the mouth of the culvert. Furthermore, he had given his consent for refuse, rocks, dirt and other debris to be dumped on the hillside above his residence and adjacent to the branch whereby it would most certainly find its way to the stream below, even by ordinary rainfall, and clearly so by a very heavy rain, and which the proof

showed did happen. Some of the witnesses describing the character of rainfalls of which complaint is made. referred to them as sudden splashes and when the evidence of other witnesses, in attempted contradiction thereof is examined it becomes easily discernible that the big flood of July 24, 1939, producing the greater part of the damage complained of, was undoubtedly the result of an unusual rain for that locality.

The argument in brief of counsel for plaintiff, to the effect that the alteration in the switch leading from defendant's track to the plant of the Products Company caused more water to reach the upper end of the culvert than theretofore, is in direct conflict with the extract, supra, taken from the same brief. But independently of that fact, the culvert continued to take care of all water from usual rains between the change and time of the floods of which plaintiff complains, and it was only after he contracted for the dumpage by the Products Company on his surface that the damaging floods occurred. Moreover, the change in the switch was not one made by defendant, but only by the Products Company, although defendant did the construction work in making it, but according to plans and specifications and under the direction of the Products Company which paid defendant therefor.

If, however, there should be found in the record some supporting evidence of the charges of negligence against defendant, nevertheless we are confident that it does not extend beyond the limits of a scintilla of proof, which we held in the case of Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877, as insufficient to authorize a submission of the issue to the jury, and in such circumstances the court should peremptorily instruct the jury against the scintilla. That ruling was a departure from what this court had theretofore held, but it was in conformity with the rulings of the great majority of courts throughout the country. In fact, but two states in the Union were then committed to the rule of submitting the case to the jury upon only a scintilla of proof, although a new trial would be granted if a verdict was returned in favor of the scintilla. In such circumstances we concluded in the Nugent opinion that the theretofore practice in this jurisdiction was without foundation in logic or reason and because of which we joined the overwhelming majority of courts by approving the rule which they had long since adopted. Since

the rendition of the Nugent opinion we have steadfastly followed it in all cases where the question was presented, and our faith in its propriety has not since become shaken.

Wherefore, for the reasons stated, the judgment is reversed, with directions to set it aside and if the evidence on another trial, if one should be had, is substantially the same, a directed verdict in favor of defendant should be given.